**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| KENNETH COLSTON and | ) | |
| CATHY CLEMONS, | ) | |
| individually and on behalf all others | ) | |
| similarly situated, | ) | **CASE NO._____** |
| | ) | |
| Plaintiffs, | ) | **CLASS ACTION** |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| ENVISION CREDIT UNION, | ) | |
| | ) | |
| Defendant. | ) | |

**CLASS ACTION COMPLAINT**

Plaintiffs, KENNETH COLSTON and CATHY CLEMONS, on behalf of themselves and all others similarly situated, bring this action against Defendant ENVISION CREDIT UNION ("Envision" or "Defendant") to obtain damages, restitution, and injunctive relief for the Class, as defined below, from the Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

## I.    NATURE OF THE ACTION

1.    Envision purports to be the premier credit union that serves as a financial partner for residents and employees across multiple counties in North Florida and South Georgia. Tens of thousands of consumers bank or otherwise utilize financial services through Defendant, and in so doing provide it with a host of their personally identifiable information and highly sensitive

financial information (the "Private Information").[1]

2.      In August 2021, Envision discovered that an unauthorized individual accessed its computer network system, including customers' Private Information (the "Data Breach").

3.      The Private Information exposed in the Data Breach included, among other things, names, Social Security numbers, financial account information, payment card information, driver's license and/or state identification numbers, passport numbers, military identification numbers, and/or similar numbers issued on a government document.

4.       Even worse, Envision delayed more than six months before it informed customers that their Private Information was subject to unauthorized access in the Data Breach.

5.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect customer Private Information.

6.      Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that Defendant collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

7.      Defendant Envision maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or to trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on their face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security number, passport number, driver's license number, financial account number).

vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

8.     Defendant disregarded the rights of Plaintiffs and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard customers' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

9.     In addition, Envision and its employees failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant properly monitored its property, it would have discovered the intrusion sooner or prevented it altogether.

10.     Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

11.     Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

12.     As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

13.     Plaintiffs and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

14.     Through their Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

15.     Plaintiffs seek remedies including, but not limited to, compensatory damages, nominal damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

16.     Accordingly, Plaintiffs bring this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) negligence *per se,* (iii) breach of implied contract, (iv) unjust enrichment, and (v) breach of confidence.

## II.      JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

18.     This Court has personal jurisdiction over Defendant because the conduct at issue in this case occurred, among other locations, in this District, where Defendant is headquartered.

19.     Venue is proper because a substantial portion of the events complained of occurred in this District.

### III.     PARTIES

17.     Plaintiff Kenneth Colston is, and at all times mentioned herein was, an individual citizen of the State of Florida residing in the city of Midway. In connection with establishing accounts at Envision, Plaintiff Colston provided his Private Information to Defendant. Plaintiff received notice of the Data Breach on or about January 28, 2022. A copy of the notice he received is attached as Exhibit A (the "Colston Notice Letter").

18.     Plaintiff Cathy Clemons is, and at all times mentioned herein was, an individual citizen of the State of Florida residing in the city of Tallahassee. In connection with establishing accounts at Envision, Plaintiff Clemons provided her Private Information to Defendant. Plaintiff received notice of the Data Breach on or about January 28, 2022. A copy of the notice she received is attached as Exhibit B (the "Clemons Notice Letter").

19.     Defendant Envision is a Florida corporation with its principal place of business in Tallahassee, Florida.

### IV.     STATEMENT OF FACTS

*Nature of Defendant's Business*

20.     Defendant Envision is a full-service credit union with branches in Florida and Georgia.

21.     In the ordinary course of doing business with Defendant, customers are required to provide Defendant with sensitive, personal and private information such as:

    a.      Names;

    b.      Social Security numbers;

    c.       Financial account information;

    d.       Payment card information;

    e.       Driver's license and/or state identification number,

    f.       Passport number;

    g.       Military identification number, and/or

    h.       Similar number issued on a government document.

22.    Defendant promises its customers that "we go to great lengths to safeguard your information" and "your information is safe with us."[2]

## V.    THE DATA BREACH

23.    On or about August 5, 2021, Envision became aware of suspicious activity within its network.[3]

24.    It soon thereafter initiated an investigation into the Data Breach. The investigation revealed that "information may have been accessed without authorization during this incident from August 5, 2021, through August 7, 2021."[4]

25.    Envision launched an investigation into the ransomware attack on its network and learned that there was unauthorized activity in Envision's network between August 5, 2021, and August 7, 2021. During that time, an unauthorized party obtained files stored on some of its servers.[5]

26.    Upon information and belief, the group behind the ransomware attack was LockBit 2.0. According to an analysis about LockBit written by noted cybersecurity experts Kaspersky,

---

[2] *See* https://www.envisioncu.com/Security.
[3] *See* Colston Notice Letter, Ex A.
[4] *Id.*
[5] *Id.*

LockBit 2.0 causes ransomware to spread through group policies that represent the last stage of a cyberattack.[6]

27.     Upon information and belief, the first stages of a LockBit 2.0 cyberattack involved gaining unauthorized access to and entering Defendant's networks, hijacking the domain controller, and exfiltrating the Private Information of Plaintiffs and Class Members.

28.     As the last stage of the cyberattack, the attackers initiated the ransomware software, froze the systems of Envision, and demanded a payment. The attackers also threatened to publish the stolen (exfiltrated) data on August 30, 2021.[7]

29.     LockBit is a cybercrime group advertising that it automates infection of local computers through a domain controller. LockBit uses the Ransomware as a Service (RaaS) model, where it rents out its infrastructure and malware to the actual attackers for a share of the ransom. LockBit uses so-called "double extortion," where the attackers threatened to publish the victim's sensitive information or data if the victim does not pay up.[8]

30.     Upon information and belief, the cyberattack involved the Private Information of tens of thousands of consumers, including Plaintiffs.

31.     Plaintiffs believe their Private Information was stolen (and subsequently sold or published) in the Data Breach.

32.     Despite being aware of the Data Breach since at least August 5, 2021, Envision did not begin to notify affected consumers until January 2022, six months after the Data Breach was discovered.

---

[6] https://www.kaspersky.com/blog/ransomware-group-policies/40877/ (last accessed February 18, 2022)
[7] *See* https://cyberintelmag.com/attacks-data-breaches/envision-credit-union-hit-by-possible-lockbit-ransomware-attack/.
[8] *Id.*

33.     The files stolen from Envision contained at least the following information of Plaintiffs and Class Members: names, Social Security numbers, financial account information, payment card information, driver's license and/or state identification numbers, passport numbers, military identification numbers, and/or similar numbers issued on a government document.

34.     The Private Information contained in Envision's network was not encrypted.

35.     Plaintiffs' Private Information was accessed and stolen in the Data Breach. Plaintiffs believe their stolen Private Information is currently available for sale on the Dark Web because that is the *modus operandi* of cybercriminals.

36.     Consistent with this notification, Envision admits in the Notice to States Attorneys Generals that Plaintiffs' Private Information was "accessed" by cybercriminals in the Data Breach.[9]

37.     As a result of the Data Breach, Envision, by way of its Notice Letter, encouraged Plaintiffs and Class Members to take steps to protect their identities in order to mitigate their damages and also encouraging Class Members to enroll in credit monitoring and identity protection services.

38.     That Envision is encouraging impacted persons to take steps to mitigate their damages and also enroll in credit monitoring and identity theft restoration services is an acknowledgment that the impacted persons are subject to a substantial and present risk of fraud and identity theft.

---

[9] *See* Envision Credit Union - Notice of Data Event - ME - Exhibit 1.pdf (Jan. 28, 2022), https://apps.web.maine.gov/online/aeviewer/ME/40/31601cbb-261c-4594-ba9a-93e69dfa5cad.shtml.

39.     Envision had obligations created by contract, industry standards, and common law to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

40.     Envision could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

### Defendant Acquires, Collects, and Stores Plaintiffs' and Class Members' PII

41.     Envision acquires, collects, and stores a massive amount of PII on its applicants, employees, former employees and other personnel.

42.     As a condition of opening account and receiving certain financial services, Envision requires that employees, former employees and other personnel entrust it with highly sensitive personal information.

43.     By obtaining, collecting, and using Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

44.     Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

45.     Plaintiffs and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### The Cyberattack Attack and Data Breach were
### Foreseeable Risks of which Defendant was on Notice

46.     It is well known that PII, including Social Security numbers in particular, is an invaluable commodity and a frequent target of hackers.

47.     Individuals place a high value not only on their PII, but also on the privacy of that data. This is because identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.

48.     Individuals are particularly concerned with protecting the privacy of their Social Security numbers, which are the "secret sauce" that is "as good as your DNA to hackers." There are long-term consequences to data breach victims whose social security numbers are taken and used by hackers. Even if they know their Social Security numbers have been accessed, Plaintiffs and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse. Even then, the Social Security Administration has warned that "a new number probably won't solve all [] problems . . . and won't guarantee . . . a fresh start."

49.     In 2021, there were a record 1,862 data breaches last year, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[10]

50.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Envision knew or should have known that its electronic records would be targeted by cybercriminals.

51.     Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

---

[10] Bree Fowler, *Data breaches break record in 2021*, CNET (Jan. 24, 2022), https://www.cnet.com/tech/services-and-software/record-number-of-data-breaches-reported-in-2021-new-report-says/.

52.     Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Envision failed to take appropriate steps to protect the PII of Plaintiffs and the proposed Class from being compromised.

53.     Accordingly, as outlined below, Plaintiffs and Class Members now face an increased risk of fraud and identity theft. Plaintiffs and the Class Members also lost the benefit of the bargain they made with Defendant.

### *At All Relevant Times Envision Had a Duty to Plaintiffs and Class Members to Properly Secure their Private Information*

54.     At all relevant times, Envision had a duty to Plaintiffs and Class Members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiffs and Class Members, and to promptly notify Plaintiffs and Class Members.

55.     Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

56.     Defendant's duty of care to use reasonable security measures arose as a result of the relationship that existed between Defendant and its customers, which is recognized by state and federal laws and regulations, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from

11

a data breach.

57.     Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

58.     Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information when Envision became aware that their PII may have been compromised.

59.     Envision had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, Envision breached its common law, statutory, and other duties owed to Plaintiffs and Class Members.

60.     Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

   a.     Maintaining a secure firewall configuration;

   b.     Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

   c.     Monitoring for suspicious or irregular traffic to servers;

   d.     Monitoring for suspicious credentials used to access servers;

   e.     Monitoring for suspicious or irregular activity by known users;

   f.     Monitoring for suspicious or unknown users;

g.     Monitoring for suspicious or irregular server requests;

h.     Monitoring for server requests for PII;

i.     Monitoring for server requests from VPNs; and

j.     Monitoring for server requests from Tor exit nodes.

61.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[11] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[12]

62.    The ramifications of Envision's failure to keep its consumers' PII secure are long lasting and severe. Once PII is stolen, particularly Social Security and driver's license numbers, fraudulent use of that information and damage to victims may continue for years.

### The Value of Personally Identifiable Information

63.    The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200.[13]

64.    Criminals can also purchase access to entire company data breaches from $900 to

---

[11] 17 C.F.R. § 248.201 (2013).

[12] *Id.*

[13] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

$4,500.[14]

65.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[15]

66.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

67.    Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[16]

---

[14] *In the Dark*, VPNOverview (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

[15] Social Security Administration, *Identity Theft and Your Social Security Number* (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[16] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

68.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[17]

69.     PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number. This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[18]

70.     Given the nature of the Data Breach, it is foreseeable that the compromised PII can be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Class Members' PII can easily obtain Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

71.     The information compromised in this Data Breach is static and difficult, if not impossible, to change (such as Social Security numbers).

72.     To date, Envision has offered its consumers only one year of identity monitoring service through Experian IdentityWorks. The offered services are inadequate to protect Plaintiffs and Class Members from the threats they face for years to come, particularly in light of the PII at issue here.

73.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Envision's failure to implement or maintain adequate data security measures for its current and

---

[17] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[18] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n.1.

former customers.

### *Envision Failed to Comply with FTC Guidelines*

74.     Federal and State governments have likewise established security standards and issued recommendations to temper data breaches and the resulting harm to consumers and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[19]

75.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[20] The guidelines note businesses should protect the personal consumer and consumer information that they keep, as well as properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.

76.     The FTC recommends that companies verify that third-party service providers have implemented reasonable security measures.[21]

77.     The FTC recommends that businesses:

    a.      Identify all connections to the computers where you store sensitive information.

    b.      Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

---

[19] Federal Trade Commission, *Start With Security: A Guide for Business* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[20] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[21] FTC, *Start With Security*, *supra* note 16.

c.   Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d.   Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.   Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks.

f.   Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g.   Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h.    Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i.    Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

78.    The FTC has brought enforcement actions against businesses for failing to protect consumer and consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

79.    Because Class Members entrusted Envision with their PII, Envision had, and has, a duty to the Class Members to keep their PII secure.

80.    Plaintiffs and the other Class Members reasonably expected that when they provide PII to Envision, Envision would safeguard their PII.

81.    Envision was at all times fully aware of its obligation to protect the personal and financial data of employees, including Plaintiffs and Members of the Class. Envision was also aware of the significant repercussions if it failed to do so.

82.    Envision's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—including Plaintiffs' and Class Members' Social Security numbers, driver's license numbers, financial account information, and other highly

sensitive and confidential information—constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

### *Envision Fails to Comply with Industry Standards*

83.     Several best practices have been identified that at a minimum should be implemented by companies like Defendant Envision, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

85.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

86.     These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

*Plaintiffs and Class Members Have Suffered Concrete Injury and Damages As A Result Of Defendant's Inadequate Security And The Data Breach It Allowed*

87.     Plaintiffs and Class Members reasonably expected that Defendant would provide adequate security protections for their PII, and Class Members provided Defendant with sensitive personal information, including their Social Security numbers.

88.     Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to bank with Defendant, Plaintiffs understood and expected that they would receive data security, when in fact Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received data security that was of a lesser value than what they reasonably expected. As such, Plaintiffs and the Class Members suffered pecuniary injury and damages.

89.     Cybercriminals capture PII to exploit it; the Class Members are now, and for the rest of their lives will be, at a heightened and substantial risk of identity theft. Plaintiffs have also incurred (and will continue to incur) damages in the form of, *inter alia*, loss of privacy and costs of engaging adequate credit monitoring and identity theft protection services.

90.     The cybercriminals who obtained the Class Members' PII may exploit the information they obtained by selling the data in so-called "dark markets." Having obtained these names, addresses, Social Security numbers, and other PII, cybercriminals can pair the data with other available information to commit a broad range of fraud in a Class Member's name, including but not limited to:

- obtaining employment;

- obtaining a loan;

- applying for credit cards or spending money;

- filing false tax returns;

- stealing Social Security and other government benefits; and

- applying for a driver's license, birth certificate, or other public document.

91.   In addition, if a Class Member's Social Security number is used to create false identification for someone who commits a crime, the Class Member may become entangled in the criminal justice system, impairing the person's ability to gain employment or obtain a loan.

92.   As a direct and/or proximate result of Defendant's wrongful actions and/or inaction and the resulting Data Breach, Plaintiffs and the other Class Members have been deprived of the value of their PII, for which there is a well-established national and international market.

93.   Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.[22]

94.   Accordingly, Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiffs and the other Class Members at an imminent, immediate, and continuing increased risk of identity theft and identity fraud.[23] Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach."[24] Javelin Strategy & Research, a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[25] Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that have not

---

[22] *Id.*

[23] *Data Breach Victims More Likely To Suffer Identity Fraud*, INSURANCE INFORMATION INSTITUTE BLOG (Feb. 23, 2012), http://www.iii.org/insuranceindustryblog/?p=267.

[24] Susan Ladika, *Study: Data Breaches Pose A Greater Risk*, CREDITCARDS.COM (July 23, 2014), http://www.creditcards.com/credit-card-news/data-breach-id-theft-risk-increase-study-1282.php.

[25] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") quals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3–4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

yet been exploited by cybercriminals bears a high risk that the cybercriminals who now possess Class Members' PII will do so at a later date or re-sell it.

95.     As a result of the Data Breach, Plaintiffs and Class Members have already suffered damages.

96.     Defendant openly admits that the cybercriminals "acquired" and "obtained" Plaintiffs' and Class Members' data in the Breach.

### *Plaintiffs' Experiences*

97.      To date, Envision has merely offered twelve (12) months of identity monitoring services. The offer, however, is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information.

98.     Furthermore, Defendant's credit monitoring offer to Plaintiffs and Class Members squarely places the burden on Plaintiffs and Class Members, rather than on the Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiffs and Class Members  in credit  monitoring services upon discovery of the breach, Defendant merely sent instructions offering the services to affected customers with the recommendation that they sign up for the services.

### *Plaintiff Kenneth Colston*

99.     After the Data Breach, Plaintiff Colston identified a fraudulent charge on his credit card. On or about November 25, 2021, Plaintiff Colston received notification from Cash App, a mobile payment service, that an unauthorized individual had tried to make a fraudulent purchase of $11.18. In response to his incident, Plaintiff Colston contacted Cash App, Amazon, and

Defendant Envision, the bank that issued the credit card. Plaintiff Colston replaced his credit card. Plaintiff Colston spent about two hours resolving this issue.

100.   After the Data Breach, Plaintiff Kenneth Colston experienced a substantial increase in spam phone calls. These spam calls were to a mobile phone number Plaintiff Colston provided to Envision.

101.   After the Data Breach, Plaintiff Kenneth Colston subscribed to a credit monitoring service offered by Equifax at a cost of $70/year. Plaintiff Colston also obtained a spam call blocker from AT&T.

102.   Accordingly, because of the Data Breach, and pursuant to Defendant's own instructions set forth in the Notice of Data Breach, Plaintiff was required to spend time monitoring his credit history and financial accounts for suspicious activity. Plaintiff Colston estimates he does this twice a week for 30 minutes.

103.   Plaintiff has been very careful about sharing PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

104.   Plaintiff stores documents containing PII in a safe and secure location and shreds documents he receives in the mail that contain any PII, or that may contain any information that could otherwise be used to compromise his credit card accounts and identity. Moreover, he diligently chooses unique usernames and passwords for their various online accounts.

105.   Plaintiff suffered actual injury and damages because of the Data Breach. Implied in his banking agreements with Envision was the requirement that it adequately safeguarded his PII. Plaintiff would not have banked with Envision had Envision disclosed that it lacked data security practices adequate to safeguard PII.

106.   Plaintiff suffered actual injury in the form of damages and diminution in the value

of his PII—a form of intangible property that he entrusted to Envision, and which was compromised by the Data Breach.

107.    Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of his privacy, especially his Social Security number.

108.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his stolen PII, especially his Social Security number, being placed in the hands of unauthorized third parties and possibly criminals.

109.    Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Envision's possession, is protected and safeguarded from future breaches.

### Plaintiff Cathy Clemons

110.    After the Data Breach, Plaintiff Cathy Clemons experienced a substantial increase in spam phone calls. These spam calls were to a mobile phone number Plaintiff Clemons provided to Envision.

111.    As a result of the Data Breach, and pursuant to Defendant's own instructions set forth in the Notice of Data Breach, Plaintiff Clemons was required to spend time monitoring her credit history and financial accounts for suspicious activity.

112.    In response to the Notice of Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which included and will include time spent verifying the legitimacy of the *Notice of Data Breach*, exploring credit monitoring and identity theft insurance options, and self-monitoring her accounts. This time has been lost forever and cannot be recaptured.

113.    Plaintiff Clemons is very careful about sharing PII and has never knowingly

transmitted unencrypted PII over the internet or any other unsecured source.

114.    Plaintiff Clemons stores documents containing PII in a safe and secure location and shreds any documents she receives in the mail that contain any PII, or that may contain any information that could otherwise be used to compromise her credit card accounts and identity. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

115.    Plaintiff Clemons suffered actual injury and damages because of the Data Breach. Implied in her banking agreements with Envision was the requirement that it adequately safeguarded her PII. Plaintiff would not have banked with Envision had Envision disclosed that it lacked data security practices adequate to safeguard PII.

116.    Plaintiff Clemons suffered actual injury in the form of damages and diminution in the value of her PII—a form of intangible property that she entrusted to Envision, and which was compromised by the Data Breach.

117.    Plaintiff Clemons suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of her privacy, especially her Social Security number.

118.    Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her stolen PII, especially her Social Security number, being placed in the hands of unauthorized third parties and possibly criminals.

119.    Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Envision's possession, is protected and safeguarded from future breaches.

## VI.   CLASS ACTION ALLEGATIONS

120.   Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class").

121.   Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> All persons whose Private Information was maintained on Defendant Envision's computer systems that were compromised in the Data Breach, and who were sent Notice of the Data Breach.

122.   Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

123.   Plaintiffs hereby reserve the right to amend or modify the Class definitions with greater specificity or division after having had an opportunity to conduct discovery.

124.   **Numerosity.** The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Class consists of 55,694 persons whose data was compromised in Data Breach.

125.   **Commonality.** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.   Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.      Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.      Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.      Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.      Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.      Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h.      Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i.      Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.      Whether Defendant's conduct was negligent;

k.      Whether Defendant breached an implied contract;

l.      Whether Defendant was unjust enriched; and

m.      Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

126.    Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

127.    **Adequacy of Representation.** Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

128.    **Predominance.** Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

129.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

130.    Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

131.    Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.      Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

b.      Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

c.      Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

d.      Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

e.      Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the *Data Breach.*

132.    Finally, all Members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## VII.   CAUSES OF ACTION

### FIRST COUNT
**Negligence**
**(On behalf of Plaintiffs and All Class Members)**

133.   Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 132 above as if fully set forth herein.

134.   Defendant required Plaintiffs and Class Members to submit non-public PII as a condition of providing financial services.

135.   Plaintiffs and the Class Members entrusted their PII to Defendant with the understanding that Defendant would safeguard their information.

136.   Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

137.   By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it— to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

138.   Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

139.    Defendant had a duty to employ reasonable security measures and otherwise protect the PII of Plaintiffs and Class Members pursuant to Fla. Stat. § 501.171.

140.    Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

141.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.    To adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b.    Failing to adequately monitor the security of their networks and systems;

c.    Failing to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

d.    Allowing unauthorized access to Class Members' PII; and

e.    Failing to detect in a timely manner that Class Members' PII had been compromised.

142.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the industry.

143.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

144.     There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and the harm suffered, or risk of imminent harm suffered by Plaintiffs and the Class.

145.     As a result of Defendant's negligence, Plaintiffs and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: out-of-pocket expenses associated with procuring robust identity protection and restoration services; increased risk of future identity theft and fraud, the costs associated therewith; time spent monitoring, addressing and correcting the current and future consequences of the Data Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

146.     Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

147.     Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

<u>**SECOND COUNT**</u>
**Negligence *Per Se***
**(On Behalf of Plaintiffs and All Class Members)**

148.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 132 above as if fully set forth herein.

149.     Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

150. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

151. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect employee PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiffs and Class Members.

152. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se* as Defendant's violation of the FTC Act establishes the duty and breach elements of negligence.

153. Plaintiffs and Class Members are within the class of persons that the FTC Act was intended to protect.

154. The harm that occurred because of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class

155. In addition, Defendant's breached a statutory duty owed to the Plaintiffs and Class Members under conduct violated the Gramm-Leach-Bliley Act ("GBLA"), 15 U.S.C.A. § 6801, and the regulations implementing the GBLA,  16 C.F.R. § 314. (the "Safeguard Rule").

156. The GBLA required Defendant to insure the security and confidentiality of customer records and information; protect against any anticipated threats or hazards to the security or integrity of such records; and protect against unauthorized access to or use of such records or

information which could result in substantial harm or inconvenience to any customer. 15 U.S.C.A. § 6801.

157.   The Safeguard Rule requires the Defendant to maintain reasonable data security measures to protect consumer information.  Among other things, it requires  financial institutions to "[d]esignate an employee or employees to coordinate your information security program;" and "[i]dentify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that could result in the unauthorized disclosure, misuse, alteration, destruction or other compromise of such information, and assess the sufficiency of any safeguards in place to control these risks." The risk assessment should include  consideration of "[e]mployee training and management," "[i]nformation systems, including network and software design, as well as information processing, storage, transmission and disposal," and "[d]etecting, preventing and responding to attacks, intrusions, or other systems failures."[163]  16 C.F.R.  § 314.4 (b)(1)-(3). These provisions provide a specific standard of conduct breached by Defendant.

158.   Plaintiffs and Class Members are within the class of persons that the GBLA and the Safeguard Rule was intended to protect.

159.   Defendant's failure to comply with the GBLA and its implementing regulations constitutes negligence *per se*.

160.   Defendant's conduct also violated Fla. Stat. § 501.171(2). Fla. Stat. § 501.171(2) requires a covered entity to "take reasonable measures to protect and secure data in electronic form containing personal information." A "covered entity means a sole proprietorship, partnership, corporation, trust, estate, cooperative, association, or other commercial entity that acquires, maintains, stores, or uses personal information."  Fla. Stat. § 501.171.2(1)(b).

161.    Defendant failed to comply with Fla. Stat. § 501.171(2). Specifically, Defendant voluntarily undertook the act of maintaining and storing Plaintiffs' PII, but Defendant failed to implement safety and security procedures and practices sufficient enough to protect from the Data Breach that it should have anticipated. Defendant should have known and anticipated that data breaches—especially health data—were on the rise, and that financial institutions were lucrative or likely targets of cybercriminals looking to steal PII. Correspondingly, Defendant should have implemented and maintained procedures and practices appropriate to the nature and scope of information compromised in the Data Breach.

162.    Plaintiffs and Class Members are within the class of persons that Fla. Stat. § 501.171(2) was intended to protect.

163.    Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

164.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

165.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that they were failing to meet their duties, and that Defendant's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their PII.

166.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**THIRD COUNT**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and All Class Members)**

167.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 132 above as if fully set forth herein.

168.    When Plaintiffs and Class Members provided their Private Information to Envision in exchange for Defendant's services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

169.    Defendant solicited and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

170.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

171.    Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Defendant failed to do so.

172.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure. Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that they adopted reasonable data security measures.

173.     Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

174.     Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

175.      As a direct and proximate result of Defendant's breaches of the implied contracts, Class Members sustained damages as alleged herein.

176.     Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

177.     Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## FOURTH COUNT
### Unjust Enrichment
### (On Behalf of Plaintiffs and All Class Members)

178.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 132 above as if fully set forth herein.

179.     Plaintiffs allege this Sixth Count (unjust enrichment) solely in the alternative to the Third Count (breach of implied contract).

180.     Plaintiffs and Class Members conferred a monetary benefit on Defendant by providing Defendant with their PII.

181.     Defendant appreciated that a monetary benefit was being conferred upon it by Plaintiffs and Class Members and accepted that monetary benefit.

182.    However, acceptance of the benefit under the facts and circumstances outlined above make it inequitable for Defendant to retain that benefit without payment of the value thereof. Specifically, Defendant enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' personal information. instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite data security.

183.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary benefit belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures.

184.    Defendant acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

185.    If Plaintiffs and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

186.    Plaintiffs and Class Members have no adequate remedy at law.

187.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered or will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and

future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

188.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

189.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

## FIFTH COUNT
### BREACH OF CONFIDENCE
#### (On Behalf of Plaintiffs and All Class Members)

190.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 132 above as if fully set forth herein.

191.    At all times during Plaintiffs' and Class Members' Interaction with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiffs' and Class Members' personal information.

192.    As alleged herein and above, Defendant's relationship with Plaintiffs and Class Members was governed by terms and expectations that Plaintiffs' and Class Members' personal information would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

193.    Plaintiffs and Class Members provided their personal information to Defendant with the explicit and implicit understandings that Defendant would protect and not permit personal information to be disseminated to any unauthorized parties.

194.    Plaintiffs and Class Members also provided their personal information to Defendant with the explicit and implicit understandings that Defendant would take precautions to protect such personal information from unauthorized disclosure.

195.    Defendant voluntarily received in confidence Plaintiffs' and Class Members' personal information with the understanding that the personal information would not be disclosed or disseminated to the public or any unauthorized third parties.

196.    Due to Defendant's failure to prevent, detect, or avoid the Data Breach from occurring by, *inter alia*, following industry standard information security practices to secure Plaintiffs' and Class Members' personal information, Plaintiffs' and Class Members' personal information was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and Class Members' confidence, and without their express permission.

197.    As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiffs and Class Members have suffered damages.

198.    But for Defendant's disclosure of Plaintiffs' and Class Members' personal information in violation of the parties' understanding of confidence, their protected personal information would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendant's Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' protected personal information, as well as the resulting damages.

199.    The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiffs' and Class Members' personal information.

200.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their personal information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their personal information; (iv) lost opportunity costs associated with effort expended to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching to prevent, detect, contest, and recover from financial fraud and identity theft; (v) costs associated with placing freezes on credit reports; (vi) the continued risk to their personal information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the personal information of patients in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the personal information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

201.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and Class Members have suffered and will continue to suffer injury and/or harm.

## VIII.   <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs pray for judgment as follows:

a.     For an Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Class;

b.     For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c.     For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d.     For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e.     Ordering Defendant to pay for lifetime credit monitoring services for Plaintiffs and the Class;

f.     For an award of actual damages, compensatory damages, and nominal damages in an amount to be determined, as allowable by law;

g.     For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

h.     Pre- and post-judgment interest on any amounts awarded; and

i.     Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: February 18, 2022                    Respectfully submitted,


/s/ *Katherine Earle Yanes*
Katherine Earle Yanes (FB# 159727)
**KYNES, MARKMAN & FELMAN, P.A.**
P.O. Box 3396
Tampa, FL 33601-3396
Telephone: (813) 229-1118
Facsimile: (813) 221-6750
Kyanes@kmf-law.com

*Local Counsel for Plaintiffs and the Putative Class*

Gary E. Mason*
**MASON LIETZ & KLINGER LLP**
5101 Wisconsin Avenue NW, Suite 305
Washington, DC 20016
Telephone: (202) 429-2290
Facsimile: (202) 429-2294
gmason@masonllp.com

*pro hac vice to be filed*                    *Counsel for Plaintiffs and the Putative Class*